1997-NMCA-084

944 P.2d 896

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Calvin Dean PETERS, Defendant–
Appellant.**

No. 16943.

Court of Appeals of New Mexico.

June 19, 1997.

Certiorari Denied Aug. 12, 1997.

OPINION

BOSSON, Judge.

1. Defendant Calvin Peters was indicted on three counts of criminal sexual penetration in the second degree, two counts of kidnaping, two counts of aggravated battery, two counts of aggravated burglary, and one count of armed robbery. The charges arose from separate attacks on two victims. After a jury trial, Defendant was found guilty on all counts.

2. On appeal, Defendant raises numerous issues, the most significant of which concern DNA evidence and the trial court's decision to join in one trial all counts arising from the two attacks. Specifically, we address the question under Rule 11–404(B) NMRA 1997 whether evidence relating to one attack would have been admissible in a separate trial of the other attack for purposes of identifying Defendant as the likely assailant. We uphold the trial court on all challenges and affirm the conviction.

**BACKGROUND**

3. Mrs. J. was raped, beaten, and robbed by an intruder who entered her home in the evening armed with a knife. The man hit Mrs. J. in the face causing cuts and bruises, then knocked her to the floor and raped her. Afterward, the assailant tied Mrs. J.'s hands and feet, gagged her, and covered her face with a towel. He then asked Mrs. J. where her purse was and took money from it. Mrs. J. freed herself and went to her neighbor's home where she called the police. She described her assailant as being either Hispanic or Indian, about 5'4" in height with a terrible odor. At the time of the attack, Mrs. J. was 82 years old and lived by herself. Mrs. J. died from unrelated causes before any arrest had been made in the case.

4. Mrs. B., a 71 year old woman, was raped by a small man who entered her home in the middle of the night armed with a knife. Mrs. B lived in the same neighborhood within a mile of Mrs. J. The assailant cut Mrs. B. with the knife and hit her on the face and head. After the rape, the assailant tied Mrs. B.'s hands and feet, gagged her, and covered her face with a sheet. He then asked Mrs.

Tom Udall, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, for Appellee.

Liane E. Kerr, Albuquerque, for Appellant.

B. where her purse was located. Mrs. B. told the police that she believed her assailant was Calvin Dean Peters, a Navajo, whom she had met in April 1990. Defendant had come to her home with Don Thompson, his stepfather, who had done yard work for her. Mrs. B. also told police that during the first visit, Defendant had made improper advances toward her.

5. Each victim was taken to the hospital for examination and treatment. In both cases, the emergency room nurse completed sexual assault evidence kits which included semen samples from each victim. Based on Mrs. B.'s identification of her assailant, a blood sample was obtained from Defendant for DNA testing which showed a match between the DNA profiles of Defendant and the assailant in each attack.

## DISCUSSION

### Motion to Sever

6. Defendant made a pretrial motion to sever counts which was denied by the trial court. On appeal, Defendant raises the issue of whether the trial court erred in failing to sever counts 1–6, resulting from the first attack, from counts 7–10, the charges from the second attack. Defendant argues that the failure to sever was error because the prejudice of joinder outweighed any considerations of judicial economy.

7. In his motion to sever Defendant argued that evidence of one attack would not tend to establish motive, intent, absence of mistake or accident, identity, or common scheme or plan for the other attack. *See* Rule 11–404(B). The State responded that the DNA evidence linked Defendant with both rape victims and that the manner in which the crimes had been committed pointed to a single modus operandi used by Defendant.

8. In the order denying severance, the trial court found that joinder had been proper because of the similarities between the two attacks and that there would be no undue prejudice against Defendant from a single trial. Additionally, the court determined that a single trial would serve the interests of judicial economy because of the scientific testimony that would be offered by both the State and Defendant for each attack.

9. Joinder of counts is governed by Rule 5–203(A) NMRA 1997 which directs that two or more offenses shall be joined in one indictment if the offenses are of the same or similar character. The statutory requirements for joinder were met in this case; the two offenses Defendant moved to sever, criminal sexual penetration in the second degree, were of the same character. Rule 5–203(A)(1). *See* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 17.1, at 354 (1984) (permissible to join instances of the same crime, although the acts were committed by defendant at different times and were not part of a single scheme).

10. When the requirements of joinder are met, severance may still be granted if it appears that either the defendant or the State will be prejudiced by joinder. Rule 5–203(C). In this case, Defendant bears the burden of showing unfair prejudice. *See State v. Gallegos,* 109 N.M. 55, 63, 781 P.2d 783, 791 (Ct.App.1989). Severance is a matter within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. *Id.* at 63–64, 781 P.2d at 791–92.

### Rule 11–404(B)

11. Defendant argues that severance should have been granted because he was prejudiced at the joint trial by evidence of both assaults, which, he asserts, would have been inadmissible in separate trials. *See Gallegos,* 109 N.M. at 64, 781 P.2d at 792. Defendant maintains that trying the charges together allowed the State to introduce improper evidence of criminal disposition.

12. If evidence of one offense would be admissible in the trial of the other, a trial court does not abuse its discretion in denying a motion to sever. *State v. Jones,* 120 N.M. 185, 186, 899 P.2d 1139, 1140 (Ct. App.1995), *cert. quashed,* 121 N.M. 57, 908 P.2d 750 (1996). When the relevant evidence is cross-admissible in separate trials, the risk of prejudice from joining the charges in a single trial does not differ from that faced in separate trials for the offenses. *See State v.*

*Griffin,* 116 N.M. 689, 693, 866 P.2d 1156, 1160 (1993). This Court has used a two-step method for assessing the admission of evidence of other crimes or bad acts under Rule 11–404(B). *Jones,* 120 N.M. at 187, 899 P.2d at 1141. The first step requires that the proponent articulate the purpose for which the challenged evidence is being offered. *Id.* If the trial court determines that the evidence is relevant to a disputed issue and admission is proper under Rule 11–404(B), then the second step is the balancing process of Rule 11–403 NMRA 1997 to determine whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice. *Jones,* 120 N.M. at 187, 899 P.2d at 1141.

13. In this case the State argued that the relevant purpose for introduction of evidence of the other crime was to show identity, both through the DNA evidence and through modus operandi. Identity was a disputed issue in both offenses, and identity is a purpose that is specifically permitted under Rule 11–404(B). *See State v. Young,* 103 N.M. 313, 319, 706 P.2d 855, 861 (Ct.App.1985). Although modus operandi is not expressly stated under Rule 11–404(B), New Mexico case law has generally regarded Rule 11–404(B) as being inclusive rather than exclusive, *see Jones,* 120 N.M. at 187–88, 899 P.2d at 1141–42, and the use of modus-operandi evidence to prove identity has frequently been recognized, *see id.* at 190, 899 P.2d at 1144; *State v. Beachum,* 96 N.M. 566, 568, 632 P.2d 1204, 1206 (Ct.App.1981); *State v. Lopez,* 85 N.M. 742, 744, 516 P.2d 1125, 1127 (Ct.App.1973).

14. The identity exception to Rule 11–404(B) may be invoked when identity is at issue and when the similarity of the other crime "demonstrate[s] a unique or distinct pattern easily attributable to one person." *Beachum,* 96 N.M. at 568, 632 P.2d at 1206. Relevancy depends on the degree of similarity. *See State v. Saavedra,* 103 N.M. 282, 284, 705 P.2d 1133, 1135 (1985); *State v. Allen,* 91 N.M. 759, 761, 581 P.2d 22, 24 (Ct.App.1978). Evidence of other crimes with sufficient evidence of similar attributes has a strong probative value to show that the person who committed the other crime and the person who committed the charged crime

are the same. *See Saavedra,* 103 N.M. at 284, 705 P.2d at 1135; *cf. State v. Williams,* 117 N.M. 551, 559, 874 P.2d 12, 20 (1994) (admission of evidence of other, non-criminal acts was error because it was not relevant to establishing defendant's identity; the evidence did not constitute a " 'unique or distinct pattern easily attributable to one person' " (quoting *Beachum,* 96 N.M. at 568, 632 P.2d at 1206)); *Jones,* 120 N.M. at 190, 899 P.2d at 1144 (although similarities in crimes might not be sufficient to establish "signature," additional reason that evidence of other crime was inadmissible was that element of identity was not in issue).

15. These two assaults shared a marked number of similarities which could logically lead a jury to the inference that these two women were attacked by the same man. Both attacks occurred in the same neighborhood within a mile of each other. Both involved an assailant who entered through a window in the back of the victims' homes at night. In both occurrences, the assailant used a knife as a weapon to control the victims. The victims in each case were elderly white women who lived alone. Both women were raped and, in each case, the attacker ejaculated. Both victims described their attacker as a short, small-framed dark man with a distinctive body odor, identified by the first victim as Indian or Hispanic and by the second as Indian. After both attacks, the assailant tied each victim at the ankles and wrists, gagged them, and placed a cloth over their heads. In both cases, he asked the victims for their purses before leaving. At the scene of each attack, the police found a shoe print, size 8 to 9, which corresponded to the shoe size of Defendant. In both cases, evidence supported an inference that the assailant had become familiar with the grounds and back entries to the two homes. The two attacks share evidence of a common modus operandi by showing a distinct pattern attributable to the same assailant.

16. We are not alone in regarding the pattern as distinctive. According to trial testimony, both the emergency room nurse who treated each victim and Detective Miller from the violent crimes division came to the conclusion that the two attacks had been

committed by the same person. The emergency room nurse testified that she was specially trained to treat sexual assault victims and treated approximately twenty rapes within the course of a year. After the nurse heard the account of the attack on Mrs. B., the second victim, the nurse told the police officer accompanying the victim that the account of this attack sounded the same as the one she had heard a year ago while treating Mrs. J.

17. Two days after the attack, Mrs. B. was interviewed by Detective Miller. After talking to her, Detective Miller decided to treat her attack as a second offense. The detective had received approximately 200 hours of training for working with sexual assault cases. He subsequently obtained the sexual assault evidence kits for both women containing the semen samples of the attacker and, based on Mrs. B's identification, had a blood sample taken from Defendant. Detective Miller then arranged for DNA testing of all three samples.

18. The State offered evidence that Defendant's DNA matched that of the semen samples taken from each victim. In the attack on Mrs. B. there was both a DNA match and an identification of Defendant by the victim. The DNA evidence linked the same person to both attacks, and Mrs. B. identified Defendant as that person.

19. In determining whether a unique or distinct pattern has been demonstrated, our focus is on the similarities between the two offenses, because those similarities establish an inference of identity which is necessary for relevance. *See Allen*, 91 N.M. at 761, 581 P.2d at 24. Professor Wigmore has described the process in the following manner:

> [I]n practice it rarely occurs that the evidential mark [in support of an inference of identity] is a *single* circumstance. The evidencing feature is usually a group of circumstances, which as a whole constitute a feature capable of being associated with a single object. Rarely can one circumstance alone be so inherently peculiar to a single object. It is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot

be supposed to be associated with more than a single object.

2 John Henry Wigmore, *Evidence* § 411 (Chadbourn rev. 1979).

20. All of this evidence is material to the issue of identity and was offered for a proper purpose under Rule 11–404(B). We agree with the trial court that the two attacks displayed sufficiently distinctive similarities to permit an inference of pattern for purposes of proving identity. That inference is even more relevant when the factual similarities between the two assaults are coupled with the DNA evidence corroborating the identification of Defendant as the assailant. Taken together, the evidence is Defendant's "signature" for evidentiary purposes which satisfies the stricter test of admissibility under Rule 11–404(B) for purposes of identity. *See Williams*, 117 N.M. at 559, 874 P.2d at 20. The evidence in this case is similar in nature to that in *United States v. Quinn*, 18 F.3d 1461, 1466 (9th Cir.1994) (upholding admission of evidence of bank robber wearing dark clothes and mask, committing "taken over" robberies at banks near one another, when robber at each bank was of similar size and used similar weapon).

### Rule 11–403

21. Defendant asserts that the trial court erred because the prejudicial effect of the evidence of both crimes outweighed any probative value. We disagree. Under Rule 11–403, the trial court is required to balance the probative value of evidence against the danger of unfair prejudice to the defendant. In denying the motion to sever, the trial court determined that a joint trial would not be unduly prejudicial to Defendant. The decision to admit or exclude evidence under Rule 11–403 is a matter within the discretion of the trial court. *State v. Chamberlain*, 112 N.M. 723, 726, 819 P.2d 673, 676 (1991).

22. The trial court observed that judicial economy would be served by a single trial on all counts. *See State v. Gammill*, 102 N.M. 652, 655, 699 P.2d 125, 128 (Ct.App. 1985) (in considering a motion to sever, court must weigh the possibility of prejudice against the need for judicial economy). The nature of the scientific testimony was a fac-

tor in the trial court's assessment of judicial economy. The DNA evidence would have been admissible in separate trials. A single trial meant that only one jury would need to be educated about the science of DNA matching and the statistical significance of that match by the array of expert witnesses offered by the parties. In addition, many of the other witnesses, including the police officers, medical personnel, and the remaining victim, would have been the same in both trials. We conclude that the trial court carefully balanced the Rule 11–403 factors and properly found that Defendant would not be unfairly prejudiced by a joint trial. There was no abuse of discretion in denying the motion to sever.

### Admission of DNA Evidence

23. Defendant raises several challenges to the DNA evidence including the chain of custody for the biological samples; the testimony of one of the expert witnesses, Dr. Deadman; an alleged comment upon Defendant's right to remain silent; and the jury instruction on the evaluation of expert testimony.

### Chain of Custody

24. Defendant makes several claims with respect to the chain of custody for the biological samples taken from the victims and from Defendant. The samples were used by the FBI laboratory to analyze the DNA using the RFLP method; the test results established the starting point for the testimony offered by all expert witnesses. *See State v. Anderson,* 118 N.M. 284, 288–90, 881 P.2d 29, 33–35 (1994) (describing FBI methodology for DNA analysis).

25. Defendant argues that the chain of custody for the samples was not sufficiently established because the person who received the samples at the crime laboratory of the Arizona Department of Public Safety (ADPS) did not testify, the person who received the samples at the FBI laboratory did not testify, and the technician who performed the tests upon the samples at the FBI laboratory did not testify. Defendant argues that the testimony of each witness was necessary to establish the integrity of the samples and

that because of these gaps in the chain of custody, the court erred in admitting the DNA test results.

26. In order to admit real or demonstrative evidence, the evidence must be identified either visually or by establishing custody of the object from the time of seizure to the time it is offered into evidence. *State v. Chavez,* 84 N.M. 760, 761, 508 P.2d 30, 31 (Ct.App.1973). The State is not required to establish the chain of custody in sufficient detail to exclude all possibility of tampering. *Claridge v. New Mexico State Racing Comm'n,* 107 N.M. 632, 641, 763 P.2d 66, 75 (Ct.App.1988). Questions concerning a possible gap in the chain of custody affects the weight of the evidence, not its admissibility. *See Central Sec. & Alarm Co. v. Mehler,* 121 N.M. 840, 850, 918 P.2d 1340, 1350 (Ct.App. 1996). Admission of evidence is within the trial court's discretion and there is no abuse of that discretion when the evidence is shown by a preponderance of the evidence to be what it purports to be. *State v. Sanchez,* 98 N.M. 781, 785, 652 P.2d 1232, 1236 (Ct.App. 1982).

27. In this case, the testimony established a chain of custody for the samples that formed the basis of the DNA testing from the point of collection until their arrival at the FBI laboratory. The chain of custody for Defendant's biological samples was established by testimony from the nurses who drew the two blood samples, the police officer who took those samples to ADPS, and the criminalist at ADPS who sent the samples to the FBI crime laboratory in Washington, D.C. The chain of custody for the biological samples of the victims was established by the testimony of the emergency room nurse who completed the sexual assault evidence kits for each victim, the forensic serologist who testified about the storage of the victims' blood samples, the detective who took the kits to the ADPS laboratory, and the ADPS criminalist who sent the victims' samples to the FBI laboratory. Dr. Deadman, a supervisory special agent assigned to the DNA analysis unit of the FBI crime laboratory, testified about the procedures used by the FBI laboratory for maintaining the integrity of the samples and

about the FBI's receipt of each sample from ADPS. This testimony was accompanied by documentary evidence including laboratory logs, evidence seals, letters, and shipment receipts. This testimony established with reasonable certainty that the samples taken from the victims and from Defendant were the same as those tested by the FBI laboratory. We find no abuse of discretion by the trial court in admitting the samples or the test results based on those samples.

### Reliability of the DNA Evidence

28. Dr. Deadman testified that the FBI initially obtained matches between the victims' samples and Defendant's by using four probes. *See Anderson*, 118 N.M. at 289, 881 P.2d at 34. The FBI laboratory later added a fifth and sixth probe to test the samples which also concluded in a match. Dr. Deadman referred to a report by the National Research Council, which noted that three to five probes are typically used in testing for a match. *See* National Research Council, *DNA Technology in Forensic Science* 9 (1992). He explained the methodology used by the FBI for laboratory testing of the samples; how the tests are compared to determine if the samples could have come from the same source; and if a match occurs, how its significance is assessed by statistical analysis to determine the probability of a coincidental match.

■ 29. Defendant challenges the admission of Dr. Deadman's testimony regarding the sixth probe, claiming that it was not based on scientific or technical knowledge. *See* Rule 11–702 NMRA 1997. Defendant's challenge appears to be directed to Dr. Deadman's probability calculations for the sixth probe. Dr. Deadman testified that he had not calculated a population frequency for the sixth probe but had assumed a frequency of twenty-five percent, a figure he described as "very conservative." On both direct and cross-examination, Dr. Deadman defended the basis for his probability calculations. *See Anderson*, 118 N.M. at 301, 881 P.2d at 46 (holding that questions about the accuracy of results goes to the weight of the evidence and is therefore a jury question). We believe Defendant's challenge goes to the weight of the evidence, not its admissibility, and we find no abuse of discretion by the trial court.

### Comment on Silence

■ 30. Defendant argues that one of the State's DNA experts, Dr. Hallick, commented on Defendant's right to silence in violation of his constitutional rights under the Fifth Amendment and Article II of the New Mexico Constitution. Defendant's argument is directed to the following comment of Dr. Hallick: "[Y]ou know, if I were a defendant, and I were falsely accused as being the source of biological evidence, I would want to continue testing until I found the probe that would prove the exclusion." Dr. Hallick testified that six different probes had failed to exclude Defendant as the source of the biological evidence found in the sexual assault evidence kits. In a discussion of how DNA testing might exclude a suspect, he noted that, in theory, continued testing might reveal a single probe that could be exclusionary. No objection was made at trial to this comment. We do not perceive Dr. Hallick's statement to be a comment upon Defendant's right to remain silent. *See State v. Aaron*, 102 N.M. 187, 192, 692 P.2d 1336, 1341 (Ct. App.1984) (comment on the defendant's failure to call an expert witness was not an improper comment on defendant's silence, but was rather a permissible comment on the evidence or lack thereof). Further, this comment was not made or prompted by the State. *Cf. State v. Baca*, 89 N.M. 204, 205, 549 P.2d 282, 283 (1976) (line is drawn between those comments which can be directly attributed to prosecutor and those comments included in testimony of a witness).

### Jury Instruction

■ 31. Defendant offered a jury instruction based on *Anderson*. *See Anderson*, 118 N.M. at 301, 881 P.2d at 46 ("The assessment of the validity and reliability of the conclusions drawn by the experts, however, is a jury question. The jury is free to believe or disbelieve the expert testimony."). The trial court refused Defendant's tendered instruction, submitting instead the UJI instruction on opinion testimony. *See* 14–5050

NMUJI 1997. On appeal, Defendant must show that the instruction given was erroneous and prejudicial. *See Vigil v. Miners Colfax Med. Ctr.*, 117 N.M. 665, 667, 875 P.2d 1096, 1098 (Ct.App.1994). Defendant argues that without his tendered instruction, he had no assurance that the jury understood that it could reject expert testimony. However, the UJI instruction states that the jury should give each opinion such weight as it believes the opinion deserves, and further, if the jury concludes that an opinion is not correct, the jury may disregard the opinion entirely. UJI 14–5050. The language of UJI 14–5050 is more explicit than Defendant's requested instruction in informing the jury that it may reject expert testimony. The UJI instruction was not erroneous and Defendant has shown no prejudice.

### Hearsay Testimony

■ 32. Defendant objects to the testimony of Matthew Ecker, a former Farmington police officer, as hearsay. In March 1989, Officer Ecker was the patrol officer who responded first to the report of the attack on Mrs. J. and took her initial statement about the event. He testified that Mrs. J.'s face had been beaten and was bloody, that she was crying and obviously distressed and upset. She reported to him that she had been raped and robbed and Officer Ecker testified to what Mrs. J. had told him that night. Defendant contends that the trial court erroneously admitted these statements under the catch-all exception. However, the statements were admissible under Rule 11–803(A) and (B) NMRA 1997, as Defendant recognizes in his brief. *See* Rule 11–803(A) (present sense impression) or (B) (excited utterance).

33. Defendant also challenges part of Mrs. B.'s testimony as hearsay. At trial, Mrs. B. started to talk about a conversation with Don Thompson, Defendant's step-father, that implicated Defendant. However, as Mrs. B. began to testify about the conversation, an objection was made and sustained. The trial judge told the jury to disregard the statement made by the victim, if heard, stating that it was not proper. *See State v. Vialpando*, 93 N.M. 289, 297, 599 P.2d 1086,

1094 (Ct.App.1979) (prompt admonition from court to jury to disregard inadmissible evidence sufficiently cures prejudicial effect). Defendant did not move for a mistrial or for any other response by the court.

### Evidence of Victim's Past Sexual Conduct

■ 34. Defendant claims that the trial court improperly limited his cross-examination of Mrs. B. about her past sexual conduct and how she contracted herpes. Mrs. B.'s response to interrogatories showed that she had not displayed symptoms or tested positive for the herpes virus before the rape; she had not engaged in unprotected sexual intercourse the month before the rape; and she had never been informed by a sexual partner of a positive test for herpes. On cross-examination, Mrs. B. stated that she had been diagnosed with the herpes virus several days after the rape and that she did not have symptoms in the past. A stipulation containing seven statements about the medical tests of Mrs. B. and Defendant for the herpes virus was read to the jury. The stipulation established that Defendant had tested negative for the herpes virus while Mrs. B. had tested positive. This evidence sufficiently supported Defendant's theory that he could not have transmitted the herpes virus to Mrs. B. Because there was enough evidence admitted to support the theory of the defense, it was within the trial court's discretion to disallow further inquiry into Mrs. B.'s past sexual conduct. *See* Rule 11–413(A) NMRA 1997 (evidence of victim's past sexual conduct inadmissible unless material and relevant and probative value outweighs prejudicial effect).

### Prosecutorial Misconduct

35. Defendant contends that the prosecutor engaged in misconduct by soliciting references to an unrelated charge against Defendant. Defendant argues that these comments arose during the testimony of Lt. Tolbertson, a Navajo police officer and witness for the State, and the testimony of Rosalyn Morris, sister of Defendant and witness for the defense.

36. Lt. Tolbertson testified that in October 1990, he had gone to the home of Defendant's mother, where Defendant was living. Lt. Tolbertson was asked if he had made any personal observations about Defendant's hygiene and he responded that Defendant had an odor about him. Defendant claims that Lt. Tolbertson implied that Defendant was under investigation in another case when the officer responded that, "during an investigation relating to another matter," he had noticed that Defendant had an odor about him. We find no such statement in the testimony of Lt. Tolbertson. Defendant may be referring to the testimony of Lt. Ahkeah, a criminal investigator for the Navajo police, who accompanied Lt. Tolbertson to the Peters's home and who stated that he was investigating an incident that had occurred.

37. Defendant appears to argue that the jury could infer from the fact that the police had gone to the Peters house that Defendant was a suspect in another crime. We do not agree. A police officer going to Defendant's home would not, by itself, indicate that Defendant was suspected of a crime. Defendant could have been a witness, a bystander, or a victim in an unrelated matter. There is nothing in the testimony of the two officers to indicate to the jury that Defendant was a suspect in another crime at that time; the officers did not testify about why they had gone to the Peters's home other than the retrieval of physical evidence. Rather, it is more likely that the jury would have thought that any investigation in October 1990 was related to the rape of Mrs. B. which occurred in June 1990.

38. Finally, Defendant claims prejudicial error by reference to his being in jail on another matter. During cross-examination of Ms. Morris, an alibi witness, the prosecutor challenged her knowledge of Defendant's whereabouts during March 1989 by asking her whether she was aware Defendant had been in jail on April 1, 1989. The prosecutor did not refer to any other charges in his attempt to impeach the witness's testimony. No effort was made to expand the inquiry into collateral matters. Although an objection was raised to the question, Defendant did not request a mistrial. We conclude that the reference was appropriate for cross-examination and impeachment of an alibi witness who claimed to know where Defendant was at significant dates in the trial. Moreover, the reference was limited and without undue emphasis. We see no abuse of discretion by the trial court.

39. Defendant claims that the prosecutor's remarks during closing argument, characterizing Defendant as an "animal," also amounted to prosecutorial misconduct. No objection was made at trial. Defendant argues that the prosecutor's remark nonetheless amounted to fundamental error. *See State v. Gonzales*, 113 N.M. 221, 229, 824 P.2d 1023, 1031 (1992) (failure to object to argument bars review on appeal unless the alleged error rises to the level of fundamental error); *see also State v. Gonzales*, 112 N.M. 544, 550–51, 817 P.2d 1186, 1192–93 (1991) (for doctrine of fundamental error to excuse failure to object to the argument below, the innocence of defendant must appear indisputable or guilt so doubtful that it would shock the conscience of the court for the conviction to stand). In light of the weight of the evidence presented at trial, we hold that the prosecutor's comments did not amount to fundamental error.

### Ineffective Assistance of Counsel

40. Defendant raises a claim of ineffective assistance of counsel, premised on the failure of his attorney to object to the prosecutor's closing remarks. To establish ineffective assistance of counsel, Defendant must show that his attorney was not reasonably competent and that he was prejudiced by that incompetence. *See Gonzales*, 113 N.M. at 229–30, 824 P.2d at 1031–32. A failure to object, however, does not establish ineffective assistance of counsel. *State v. Rodriguez*, 107 N.M. 611, 615, 762 P.2d 898, 902 (Ct.App.1988). Decisions concerning objections are considered to be in the area of trial tactics and ineffective assistance is not necessarily established by showing unsuccessful trial tactics. *Id.*

### Cumulative Error

41. Defendant contends that the cumulative effect of the errors in this trial deprived

him of his right to a fair trial. *See State v. Martin,* 101 N.M. 595, 600–01, 686 P.2d 937, 942–43 (1984). As discussed above, we find no error in this trial. Without error, there is no basis for a claim of cumulative error. *See Gonzales,* 112 N.M. at 553, 817 P.2d at 1195.

## CONCLUSION

42. For the reasons stated in this opinion, we affirm Defendant's convictions.

43. IT IS SO ORDERED.

PICKARD and FLORES, JJ., concur.