**Certiorari Granted, March 28, 2014, No. 34,549**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-040**

**Filing Date: December 20, 2013**

**Docket No. 30,783**

**STATE OF NEW MEXICO,**

 **Plaintiff-Appellee,**

**v.**

**JEREMY NICHOLS,**

 **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Carl J. Butkus, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**VIGIL, Judge.**

**{1}** Defendant's twin, six-month-old babies, whom we refer to as Baby Kaden and Baby Bryce, were rushed to the hospital on the afternoon of March 16, 2006, after Mother returned home from a hair appointment and shopping. Baby Kaden died, and Baby Bryce survived. After a trial based on multiple charges of child abuse of Baby Kaden and Baby Bryce,

1

Defendant was convicted of a single count of child abuse due to medical neglect resulting in death or great bodily harm to Baby Kaden.

**{2}** Defendant appeals, arguing: (1) the conviction is not supported by sufficient evidence; (2) reversible error resulted when the district court denied his motion for a severance; (3) results of medical tests were admitted into evidence in violation of Defendant's constitutional right to confront and cross examine the witnesses against him; and (4) reversible error resulted when Defendant was not allowed to ask a witness that Mother asked the witness to withdraw funds from Defendant's retirement account. We reject Defendant's arguments and affirm.

**ANALYSIS**

**1.      Sufficiency of the Evidence**

**{3}** Defendant argues on appeal that the evidence is insufficient to support the verdict of the jury that he is guilty of child abuse due to medical negligence resulting in the death of or great bodily harm to Baby Kaden. We have examined the evidence in detail and conclude that the evidence is sufficient to support the verdict.

**A.      Facts**

**{4}** The following evidence pertinent to Defendant's conviction was introduced at trial. Mother testified that Baby Kaden was acting normal the night before he died. The next morning, on March 16, 2006, she got up at 6:45 a.m. and fed the babies a bottle, then gave them a bath. When she gave Baby Kaden his bath, she did not notice any bruises or marks on him. The babies were "awake, alert, happy," and Mother did not remember Baby Kaden being sick or pale or anything like that. "I remember him just being himself." When she left the house around 9:30 a.m. to go to her parents' house and run an errand, the babies were asleep. Mother then returned home and went for a run, and the babies woke up at 12 noon after she got back home from her run. Mother took a shower, got dressed, and left home again at about 12:30 p.m. for a 12:45 p.m. hair appointment at the mall. When she left, Defendant was holding Baby Kaden, and he was "fine."

**{5}** The hair appointment lasted about two hours, and after stopping at a store within the mall, Mother started home at about 2:53 p.m. On the way home, Mother called Defendant on her cell phone to see if he needed anything, and she testified that "[h]e wanted me to come home because the babies were acting fussy," and she could hear the babies crying over the phone.

**{6}** Mother got home at "about 3:15" p.m. Defendant was sitting on the couch rocking Baby Kaden, and Baby Bryce was in his crib. Baby Kaden was "whimpering," and Mother saw that his legs "were kind of ashy color" and that he was "splotchy" like he had no circulation. "It looked like [Defendant] might have been holding him too tight." However,

2

she checked, and he was not. Mother went to Baby Bryce's crib and upon picking him up noticed he was very pale, with bruising on his lips, and on one of his fingers, the whole nail was purple. Baby Bryce was not crying or whining, but "whimpering" like Baby Kaden. Mother immediately called her aunt, who was a pediatric nurse, as well as the nurse at the babies' pediatrician's office. Both told her to call 911.

{7}    While she was on the telephone with her aunt, Mother took Baby Kaden's temperature, and it was 95. Mother remembered from a book she had on the care of a newborn that this could mean the internal organs of the baby are "shutting down." While Mother was calling 911, she noticed that Baby Kaden "was just blue, kind of just pale, pale blue ashy color." The 911 operator advised Mother to start CPR on Baby Kaden. Defendant started performing CPR on Baby Kaden, and while Mother was still on the 911 call, Defendant yelled at her that Baby Kaden had stopped breathing. The paramedics arrived while Mother was still on the 911 call.

{8}    Defendant said he woke up on March 16, 2006, at about 9:15 a.m., and Mother asked him to feed the boys because she was leaving. Baby Bryce ate his cereal, but Baby Kaden would not eat at all. "He wasn't receptive to eating and just wasn't happy." Both babies were fussy, but Baby Kaden was fussier. Defendant put Baby Bryce into his crib for a nap, but he kept holding Baby Kaden because "[h]e was still fussy, not happy." When Mother returned home, Defendant made breakfast. However, Baby Kaden still had not eaten. "It's like he wanted to, I could tell that he was hungry, but for some reason, he couldn't swallow. He couldn't stomach it."

{9}    After breakfast, Mother got ready and left for her appointment. Defendant said Baby Kaden still wasn't happy, so Defendant put him in his chair and put on a movie for him. After a little while, Baby Kaden started crying, and Defendant tried to feed him a bottle, but he only drank "about two, two CCs, which was very unlike him." Normally, Baby Kaden drank a nine-ounce bottle "in minutes" so for him to drink such a small amount—"it wasn't like him." Baby Kaden's change in eating behavior and fussiness was not at all normal for him. When he was asked if Baby Kaden got any better while Mother was at her hair appointment, Defendant said, "It appeared like he was getting better, but he just became more and more fussy. Again, it was in and out. I felt like he was, but he just kept crying at that point." Defendant said that as he watched the movie with Baby Kaden, he "became extremely agitated, really starting to cry like pretty bad." Baby Kaden seemed like he was getting more fussy, "[b]ut at the same time[,] he was becoming lethargic" and he "got very, very lethargic, very kind of yellowish." Defendant added that nothing he tried to do to soothe Baby Kaden worked. Normally, holding Baby Kaden would soothe him, but on this day, "[i]t would not soothe him at all and he just kept crying."

{10}    Defendant tried feeding Baby Kaden again between 1:00 p.m. and 2:00 p.m. because he still had not eaten. When Mother called at about 2:15 p.m., he told her that Baby Kaden was "fussy" and he asked her to come home. When Mother got home, Defendant was on the couch rocking Baby Kaden. Defendant observed that Baby Kaden was "lethargic and his

3

arms were just at his side and kind of floppy." Mother also noticed that Baby Kaden's face was pale, and pointed out to Defendant that Baby Kaden's legs were "splotchy" which Defendant described as "tiny pinpoint dots on his leg throughout both legs." While waiting for the paramedics to arrive, Defendant gave CPR to Baby Kaden, and he continued to do so until they arrived.

{11} One of the responding paramedics was Michael Levin. The 911 call was received at 3:43 p.m., and he arrived four minutes later, at 3:47 p.m. Mr. Levin testified that when he arrived at the Nichols' apartment, Baby Kaden was "not breathing on his own. He was nonresponsive. He did not have a pulse." Mr. Levin also noted that Baby Kaden had "a discoloration, a purple discoloration, on the right mandible, which is the jaw" and that "[t]here were several purple color marks on the abdomen, and there was a purple color mark on the right lower arm." He attempted to resuscitate Baby Kaden at the scene and in the ambulance to the hospital. At the hospital Baby Kaden was pronounced dead at 4:47p.m.

{12} Dr. Nine, the forensic pathologist who supervised Baby Kaden's autopsy, testified that the cause of Baby Kaden's death was a completely lacerated liver resulting from blunt force trauma. External examination of Baby Kaden's body immediately revealed several bruises on the abdomen area, on the face, the right arm, and on the lower left leg, around the knee. Dr. Nine said that "the abdomen had a lot of bruises, a number of bruises all across the front of the abdomen" and that the largest bruises on the abdomen were up to one inch over a total area of "5 to 4½ inches." All of the bruises occurred before Baby Kaden died. Microscopic examination of tissue samples from the bruises confirmed that they were bruises and that neutrophils were absent, meaning that the body had not had an opportunity to mount any kind of healing response to the bruises. Upon opening the abdominal area, a large amount of blood was found to have pooled inside the abdominal cavity and the tissue behind the abdomen from a large laceration to the liver. No other internal organs were damaged.

{13} Based on the findings, Dr. Nine concluded that a blunt object of some sort had struck Baby Kaden's abdomen with such severe pressure that it essentially broke the liver in half, which caused all the blood and bile in the liver to freely flow out into the abdominal cavity. "And once it gets into this peritoneum, the peritoneal cavity, the peritoneum is very sensitive to any kind of blood or bile that gets into it, and it becomes very painful." According to Dr. Nine, "someone with this type of injury that goes completely through the liver is not going to have a delay in his symptoms."

{14} Based on information he received that Baby Kaden was acting normal at 12 noon on March 16, 2006, Dr. Nine was of the opinion that he was injured between 12 noon that day and the time he died, about 3½ to 4 hours later. In addition, the amount of blood in the abdominal cavity and the lack of a healing response to the liver injury also supported his opinion about when the injury occurred. When asked if someone could have survived this injury, Dr. Nine answered:

I don't think someone could have survived this injury without pretty extensive medical intervention because that's a laceration that goes all the way through the liver. You basically cut the liver in half, and you will need some medical therapy, because there is going to be bleeding associated with that, then you will have peritonitis that comes in after that. Then you still have some medical therapy. But I think it's possible to survive with the right kind of treatment.

## B. Standard of Review

**{15}** Our standard of review on a claim that the evidence is insufficient to support the verdict is well settled:

> The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction. This Court views the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict.

*State v. Cabezuela*, 2011-NMSC-041, ¶ 42, 150 N.M. 654, 265 P.3d 705 (internal quotation marks and citations omitted). Moreover, the jury is free to reject Defendant's version of the events, *see State v. Garcia*, 2009-NMCA-107, ¶ 21, 147 N.M. 150, 217 P.3d 1048, and we defer to the jury when weighing the credibility of witnesses and resolving conflicting testimony. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482. Finally, we do not entertain a challenge to a conviction based on an acquittal of other charges. *See State v. Roper*, 2001-NMCA-093, ¶ 24, 131 N.M. 189, 34 P.3d 133 (stating that we review verdicts of conviction and will not entertain a contention that an acquittal is irreconcilable with a guilty verdict); *State v. Fernandez*, 1994-NMCA-056, ¶ 39, 117 N.M. 673, 875 P.2d 1104 ("[W]e review the verdict of conviction, not the verdict of acquittal.").

## C. Discussion

**{16}** Defendant contends that the State was required to prove that Defendant knew that a blunt force injury was inflicted on Baby Kaden and that he neglected to obtain medical treatment for the injury. Asserting that there was no evidence to prove he knew that a blunt force injury was inflicted upon Baby Kaden, Defendant asks us to conclude that the evidence was insufficient to support the jury's verdict. In support of his argument, Defendant relies on *State v. Leal*, 1986-NMCA-075, 104 N.M. 506, 723 P.2d 977, and *Cabezuela*, 2011-NMSC-041. Defendant's reliance on these cases is misplaced.

**{17}** In *Leal*, the defendant was charged with and convicted of "permitting" her thirteen-month-old daughter to be "cruelly punished." 1986-NMCA-075, ¶ 14. However, "[t]here was no evidence that [the] defendant was present when the child was injured, that

5

she knew of a pattern of abuse, or had reason to suspect the child would be abused, and failed to act to prevent it." *Id.* ¶ 20. There being "no proof of any act or omission by [the] defendant" we held that the evidence was insufficient to support the conviction. *Id.* ¶¶ 20-21. In *Cabezuela* the defendant was charged with and convicted of intentional child abuse. 2011-NMSC-041, ¶¶ 1, 27. After examining precedent, our Supreme Court concluded that intentional child abuse is committed when a defendant "causes" the child abuse to take place. *Id.* ¶¶ 28-33. A defendant "causes" the abuse either by actively and intentionally committing the child abuse herself, or by knowingly failing to prevent another from abusing the child. *Id.* The evidence demonstrated that the defendant intentionally abused her child either by her own actions toward the child or by failing to protect the child from her boyfriend's abuse. *Id.* ¶ 47.

**{18}** Defendant asserts that *Leal* and *Cabezuela* required the State to prove that Defendant knew that a blunt force injury was inflicted on Baby Kaden and that he failed to obtain medical treatment for the injury. This argument might have traction if Defendant was convicted of intentionally causing child abuse. However, he was not convicted of intentionally causing child abuse. Defendant was convicted of child abuse due to medical neglect resulting in death or great bodily harm to Baby Kaden.

**{19}** The unchallenged jury instructions set forth the elements of negligent child abuse that the State was required to prove beyond a reasonable doubt. *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured."). The jury was instructed that "[f]or you to find [Defendant] guilty of child abuse resulting in death or great bodily harm . . . the state must prove to your satisfaction beyond a reasonable doubt each of the following elements":

    1.    [Defendant] permitted [Baby Kaden] to be placed in a situation which endangered the life or health of [Baby Kaden], to wit: medical neglect;

    2.    [D]efendant acted with reckless disregard and without justification. To find that [Defendant] acted with reckless disregard, you must find that [Defendant] knew or should have known [D]efendant's actions or failure to act created a substantial and foreseeable risk, [D]efendant disregarded that risk and [D]efendant was wholly indifferent to the consequences of the failure to act or conduct and to the welfare and safety of [Baby Kaden];

    3.    [Defendant] was a parent, guardian or custodian of [Baby Kaden], or [D]efendant had accepted responsibility for [Baby Kaden's] welfare;

    4.    [Defendant's] actions or failure to act resulted in the death of

6

or great bodily harm to [Baby Kaden];

> 5.    [Baby Kaden] was under the age of 18;
>
> 6.    This happened in New Mexico on or between the 15th day of March, 2006 and the 16th day of March, 2006."

**{20}** There is no dispute that Defendant was Baby Kaden's parent, that the events took place on the date in question, and that Baby Kaden was under the age of eighteen. The evidence is also sufficient, under our standard of review, to prove the remaining elements. Specifically, the evidence is sufficient to prove beyond a reasonable doubt (1) that Defendant knew, or should have known, that Baby Kaden needed medical treatment and that failing to provide the medical treatment created a substantial and foreseeable risk to the life or health of Baby Kaden; (2) that he acted with reckless disregard in failing to obtain that medical treatment; and (3) that his failure to do so caused the death or great bodily harm of Baby Kaden. For all the foregoing reasons, we reject Defendant's argument that the evidence fails to support the jury's verdict.

## 2.    Motion for Severance

**{21}** Defendant contends that he is entitled to a new trial because the district court denied his motion for a severance of counts. We disagree.

### A.    Facts

**{22}** The indictment charged Defendant with three counts of child abuse regarding Baby Kaden and one count of child abuse regarding Baby Bryce. Defendant filed a motion seeking a severance of and separate trial on the charge relating to Baby Bryce. The district court denied Defendant's motion.

### B.    Standard of Review

**{23}** Rule 5-203(C) NMRA provides, "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants by the filing of a statement of joinder for trial, the court may order separate trials of offenses, grant a severance of defendants, or provide whatever other relief justice requires." Whether severance is warranted "is a matter within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion." *State v. Peters*, 1997-NMCA-084, ¶ 10, 123 N.M. 667, 944 P.2d 896.

### C.    Discussion

**{24}** Defendant argues that the district court abused its discretion in denying his motion for severance because its ruling allowed the State to introduce evidence of Baby Bryce's

injuries in the joint trial, and such evidence was not independently admissible on the charges relating to Baby Kaden.

**{25}** It is not necessary for us to decide whether the district court abused its discretion in denying Defendant's motion for severance because, even in cases where it is determined that the district court abused its discretion in refusing to sever charges, "appellate courts will not reverse unless the error actually prejudiced the defendant." *State v. Gallegos*, 2007-NMSC-007, ¶ 18, 141 N.M. 185, 152 P.3d. 828. Here, the jury found Defendant not guilty of the charge relating to Baby Bryce, and Defendant fails to demonstrate how the admission of the evidence relating to Baby Bryce caused prejudice to his defense on the single count relating to Baby Kaden on which he was convicted. Accordingly, we reject Defendant's assertion that he is entitled to a new trial on this count.

### 3. Admission of Medical Test Results

**{26}** Defendant contends he is entitled to a new trial because the results of medical tests performed on Baby Bryce were admitted into evidence through Dr. Shawn Ralston, and Dr. Ralston did not actually perform the tests. Defendant asserts the admission of this evidence violated his constitutional right under the Sixth Amendment to the United States Constitution to confront and cross examine the witnesses against him. *See* U.S. Const. Amend. VI (stating that every criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him"). We disagree with this argument as well.

### A. Facts

**{27}** Dr. Ralston treated Baby Bryce at the hospital. She testified that Baby Bryce had suffered a similar liver laceration as his brother, though his injury was far less severe. She also described how a liver laceration is treated. Defendant objected to her testimony about the results of lab tests that were performed on Baby Bryce at the hospital on the ground that such testimony would violate his right of confrontation under the Sixth Amendment to the United States Constitution because Dr. Ralston was not the individual who performed the tests. The district court ruled that Dr. Ralston referred to the test results during her treatment of Baby Bryce and that "any doctor has to use whatever's available to him to evaluate what it is they're going to do, and she can certainly testify about that . . . she did what she did during the course of her treatment, and she had to base her evaluation on something, and that's frequently lab results, records from other facilities[.]" Dr. Ralston was then allowed to testify about how she used laboratory test results performed at the hospital to treat Baby Bryce.

At the conclusion of the trial, the jury was instructed:

> You have heard testimony from certain doctors with medical expertise in certain areas that they considered and relied upon certain testing—for example laboratory test[s] that they did not personally perform.

8

Such testing was presented for the limited purpose of showing what the doctors relied upon during their care of the particular patient.

At the time this evidence was admitted, you were instructed that it could not be considered for any other purpose other than this limited purpose.

You are again instructed that you must not consider such testing for any purpose other than showing what the doctor relied upon during their care of the particular patient.

## B.     Standard of Review

**{28}**     Our review of a claimed Sixth Amendment confrontation clause violation is de novo. *State v. Tollardo*, 2012-NMSC-008, ¶ 15, 275 P.3d 110.

## C.     Discussion

**{29}**     It is not necessary for us to decide the constitutional question presented because, even if we were to agree with Defendant that the evidence was erroneously admitted, its admission into evidence was harmless beyond a reasonable doubt. A constitutional error is harmless "when there is no reasonable *probability* the error affected the verdict." *Id.* ¶ 36 (internal quotation marks and citation omitted). That is to say, "the central inquiry" is "whether an error was likely to have affected the jury's verdict." *Id.* ¶ 42.

**{30}**     Dr. Ralston testified she relied on the test results in order to treat Baby Bryce, not Baby Kaden, and the jury was instructed that it could consider the evidence only for this purpose. Moreover, Defendant was found not guilty on the charge of child abuse of Baby Bryce, and the record fails to show that the jury in any manner relied on Dr. Ralston's testimony to find Defendant guilty of child abuse of Baby Kaden. In this regard, we note that there was no dispute at trial that blunt force trauma caused Baby Kaden's liver to be lacerated in half, and that as a consequence, he died. Based on our review of the entire record in this case, we fail to see how the evidence objected to in any way contributed to the jury's determination that Defendant committed child abuse of Baby Kaden because he was negligent in providing medical care for Baby Kaden. We therefore reject Defendant's argument under this point.

## 4.     Retirement Account Testimony

**{31}**     Defendant argues that he is entitled to a new trial because the district court limited his ability to present evidence that Mother asked a friend of Defendant to pose as Defendant and withdraw funds from Defendant's 401(k) retirement account with the result that he was deprived of his constitutional right to present a defense. We reject Defendant's argument.

## A.     Facts

9

**{32}** As part of his defense, Defendant sought to introduce evidence that, in the days immediately following the death of Baby Kaden, Mother asked Defendant's best friend to pose as Defendant to withdraw the money from Defendant's 401(k) retirement plan "because she planned to leave to Mexico if she was charged." During Mother's cross examination, the State objected when defense counsel began to ask whether she had asked Defendant's friend to withdraw money from Defendant's 401(k) retirement account. Defendant argued that the evidence was admissible because "preparation for flight indicates a consciousness of guilt." The State responded that "[Mother] was not charged at [that] time" and that "[the evidence was] irrelevant in this case." After arguments, the district court allowed the inquiry, and also ruled that Defendant would be "bound by the witness' answer." Mother then denied having any such conversations.

**{33}** When Defendant called his friend to testify, the State again objected to any questions about Mother asking the friend to withdraw money from Defendant's 401(k) account. The district court ruled that the inquiry involved a collateral matter, "and, even if it does have some materiality in there, I think it's somewhat cumulative and I think it tends to, tends to go towards confusion and misleading of issues[.]" The State's objection was sustained.

### B.   Standard of Review

**{34}** We review the admission or exclusion of evidence under an abuse of discretion standard. *State v. Lopez*, 2011-NMSC-035, ¶ 4, 150 N.M. 179, 258 P.3d 458. On the other hand, we review de novo whether an evidentiary ruling results in a constitutional violation. *Id.* ¶ 10.

### C.   Discussion

**{35}** Defendant states it was his defense at trial "that he did not bring about harm to the boys and that it was possible that someone else did." Defendant contends that exclusion of the evidence deprived him of his constitutional right to present this defense because evidence that Mother "sought to fraudulently take money from their accounts, [and] evidence of her statements that she might depart if she became a target of [the] investigation were relevant to the question of third party guilt."

**{36}** What Defendant's argument overlooks is that he was convicted of child abuse by medical negligence, not intentional child abuse. Thus, we agree with the State that "the excluded testimony in no way supports a defense that Defendant did not negligently endanger [Baby] Kaden by failing to obtain medical treatment for [Baby] Kaden." We therefore conclude that the cases Defendant relies upon are not applicable. *See Holmes v. South Carolina*, 547 U.S. 319, 328-31 (2006) (holding that the defendant was deprived of his constitutional right to present a defense when his proffered evidence that another person committed the crimes was excluded on grounds that disputed forensic evidence linked the defendant to the crimes); *People v. Basuta*, 114 Cal. Rptr. 2d 285, 295 (Ct. App. 2001) (stating that in an intentional child abuse conviction, the trial court erred in excluding

10

evidence that the defendant's mother was prone to anger and violence, when the defense was that the child abuse was possibly inflicted by the mother and therefore could have caused the child's brain injury).

**{37}** Defendant does not otherwise argue that the district court abused its discretion in its ruling on this issue, and we conclude that the ruling did not infringe on Defendant's constitutional right to present a defense to the crime on which he was convicted. We therefore reject Defendant's argument under this point.

**CONCLUSION**

**{38}** The district court is affirmed.

**{39} IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**CYNTHIA A. FRY, Judge**

**Topic Index for** _State v. Nichols_**, No. 30,783**

**APPEAL AND ERROR**
Standard of Review
Substantial or Sufficient Evidence

**CONSTITUTIONAL LAW**
Confrontation

**CRIMINAL LAW**
Child Abuse and Neglect
Homicide

**CRIMINAL PROCEDURE**
Right to Confrontation
Substantial or Sufficient Evidence

**EVIDENCE**

11

Expert Witness
Substantial or Sufficient Evidence