# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>February 14, 2018</u>

**NO. A-1-CA-34082**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

**v.**

**JASON GWYNNE,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Mark T. Sanchez, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

{1}     Defendant Jason Gwynne was convicted by a jury of two counts (Counts 2 and 3) of manufacturing child pornography, a second degree felony, and one count (Count 1) of possession of child pornography, a fourth degree felony. He was sentenced to nineteen-and-one-half years in prison—nine years for each of the manufacturing counts, and eighteen months for possession—less time served. Defendant raises numerous issues on appeal, which we summarize as follows: (1) his conviction for possession must be vacated to avoid violation of his right to be free from double jeopardy; (2) multiple evidentiary errors deprived him of a fair trial; (3) his convictions for manufacturing child pornography are unconstitutional because the Legislature lacks a rational basis for criminalizing his particular alleged conduct (recording a sex act with a consenting sixteen-year-old girl) where the same conduct with an eighteen-year-old would not be a crime; and (4) there was insufficient evidence to support his convictions. We disagree with Defendant and affirm his convictions and sentence.

**BACKGROUND**

{2}     In January 2013 Defendant, at the time thirty-five years old, was living in a one-bedroom trailer with his then-sixteen-year-old stepdaughter (Stepdaughter),

whose mother had passed away in September 2012. Defendant allowed a sixteen-year-old friend (Friend) of Stepdaughter who had run away from home to stay with them. Stepdaughter slept on the pullout couch in the living room, while Defendant and Friend slept in the only bedroom. One night, Stepdaughter observed what she believed was Friend performing oral sex on Defendant in the trailer's bedroom and, after confronting Friend, reported the incident to an adult and later spoke with law enforcement. Stepdaughter reported to law enforcement that Friend and Defendant were "having a sexual affair" and that she had seen "naked pictures of unknown girls [of unknown age] on Defendant's cell phone."

{3} Law enforcement conducted a search of Defendant's residence, seized Defendant's phone, and downloaded three videos depicting Friend engaged in sexual acts. Defendant was initially charged with one count of sexual exploitation of children (possession) contrary to NMSA 1978, Section 30-6A-3(A) (2007, amended 2016).[1] After law enforcement officers further investigated the matter and obtained evidence indicating that Defendant was the male participant in what the officers believed were self-recorded videos where Defendant was engaged in sexual acts with Friend, Defendant was additionally charged with two counts of sexual exploitation

---

[1]For purposes of this opinion, the 2007 version of this statute will be referenced.

2

of children (manufacturing) in violation of Section 30-6A-3(D).[2] Defendant denied both having a sexual relationship with Friend and that he was the male participant in the video. At trial, the central issue to be decided was the identity of the male participant in the videos.

{4}     The State's first witness was Stepdaughter, whose testimony primarily established (1) when and why Friend had come to live with Stepdaughter and Defendant, (2) where Friend slept in the trailer, and (3) what prompted Stepdaughter to make a report concerning Friend and Defendant to authorities. Additionally, after the district court denied Defendant's motion in limine to exclude testimony by Stepdaughter regarding her observation of a prior sexual encounter between Defendant and Friend, Stepdaughter was allowed to testify that she once observed Friend performing oral sex on Defendant in the bedroom of the trailer.

---

[2]Defendant was not charged with any crime based on the underlying act of engaging in sexual intercourse with Friend because Friend was over sixteen years old, which is the age of consent in New Mexico. *See* NMSA 1978, § 30-9-11(G)(1) (2009) (providing that it is a fourth degree felony to sexually penetrate "a child thirteen *to sixteen* years of age when the perpetrator is at least eighteen years of age and is at least four years older than the child and not the spouse of that child" (emphasis added)); *State v. Samora*, 2016-NMSC-031, ¶ 30, 387 P.3d 230 (stating that "at age sixteen the alleged victim had passed the age of consent"). However, for purposes of the Sexual Exploitation of Children Act, NMSA 1978, §§ 30-6A-1 to -4 (1984, as amended through 2016), a "child" is considered to be anyone "under eighteen years of age." Section 30-6A-3.

{5}    The State next called Friend, who testified that she was the female in the videos and that Defendant was the male. Friend admitted that she had previously stated that the male in the video was someone other than Defendant, but at trial she testified that her prior statement was a lie. Friend stated that she was aware that the video was being made and that Defendant was the person taking the video using his own cellular phone.

{6}    Deputy Victor Hernandez of the Lea County Sheriff's Department described the investigation that followed Stepdaughter's report. He testified that when he went to Defendant's home to investigate and questioned Defendant, Defendant denied having sexual intercourse with Friend and told Deputy Hernandez that Friend slept on the couch. Deputy Hernandez's testimony also laid the foundation for the admission of State's Exhibit 1—the videos downloaded from Defendant's phone, which Deputy Hernandez seized during his investigation.

{7}    Detective Mark Munro of the Hobbs, New Mexico Police Department testified regarding the videos themselves and how he came to suspect that Defendant was both the male participant in the videos and the person who manufactured the videos. He explained that "the angle and the manner [in] which [the video] was recorded was consistent with a participant recording the video." He testified that while only the face of the female in the videos was "readily apparent," the abdomen and genitals of

4

the male participant were visible and contained what Detective Munro described as "a consistent abnormality to the abdomen, . . . some sort of a scar or possibly a tattoo" in each of the videos. He then explained that as part of his investigation he reviewed photographs of Defendant's unclothed torso that were taken by Deputy Hernandez and watched the videos again, comparing the images in the video of the male participant's abdominal area to the photographs of Defendant. Because Friend, who initially told law enforcement that Defendant was the male in the videos, changed her story and identified another person as the male participant, Detective Munro also personally examined and photographed the torso of the other suspect in order to compare it to the videos. Detective Munro explained that he "freeze frame[d] and pull[ed] . . . screenshot[s]" from the videos in order to be able to compare the images in the videos with the photographs of Defendant and the other suspect. Based on his comparison of the videos—including the screenshot images—and the photographs, Detective Munro believed that the photograph of Defendant was "consistent" with the person that he saw in the video and that the other suspect was not the person in the video.

{8}     The district court admitted, and the State published to the jury, the videos in their entirety, the photographs of Defendant's and the other suspect's respective torsos, and the screenshot images taken from the three videos showing the male

5

participant's abdominal area. The jury found Defendant guilty on all counts, and Defendant appealed.

**DISCUSSION**

**I.    Defendant's Convictions for Manufacturing and Possession of Child Pornography Do Not Violate His Right to Be Free From Double Jeopardy Under the Facts of This Case**

{9}    "The constitutional prohibition against double jeopardy protects against both successive prosecutions and multiple punishments for the same offense." *State v. Contreras*, 2007-NMCA-045, ¶ 19, 141 N.M. 434, 156 P.3d 725 (internal quotation marks and citation omitted). There are two types of "multiple punishments" cases: (1) "double[]description" cases, in which the defendant is charged with violations of multiple statutes or statutory subsections that may or may not be deemed the same offense for double jeopardy purposes; and (2) "unit of prosecution" cases, in which a defendant is charged with multiple violations of the same statute based on a single course of conduct. *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61; *see State v. Franco*, 2005-NMSC-013, ¶ 14, 137 N.M. 447, 112 P.3d 1104 (observing that the courts "treat statutes written in the alternative as separate statutes" for double jeopardy purposes). This is a "double description" case because Defendant challenges his convictions under two different subsections of Section 30-6A-3:

6

Subsection (A) (possession) and Subsection (D) (manufacturing).[3] *See Franco*, 2005-NMSC-013, ¶ 14.

{10}    In "double description" cases, we apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 9, 112 N.M. 3, 810 P.2d 1223. We "first examine whether the defendant's conduct was unitary, meaning that the same criminal conduct is the basis for both charges." *Contreras*, 2007-NMCA-045, ¶ 20 (internal quotation marks and citation omitted). "If the conduct is not unitary, then the inquiry is at an end and there is no double jeopardy violation." *Id.* (internal quotation marks and citation omitted). "If the conduct is unitary, however, then the second part of the analysis is to determine if the Legislature intended to punish the offenses separately." *State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616.

{11}    Defendant argues that the conduct underlying the manufacturing and possession of child pornography charges "was clearly unitary[.]" The State argues it was not. We agree with the State.

---

[3]While Defendant was convicted of two separate manufacturing counts under Section 30-6A-3(D)—one for each of two videos containing child pornography that the jury concluded Defendant manufactured—he does not challenge those convictions as violating the Double Jeopardy Clause under our "unit of prosecution" cases. He only challenges his conviction under Section 30-6A-3(A) for possession of child pornography as being duplicative of one of the two manufacturing counts.

{12} "In analyzing whether a defendant's conduct is unitary, we look to whether [the] defendant's acts have sufficient indicia of distinctness." *Contreras*, 2007-NMCA-045, ¶ 21 (internal quotation marks and citation omitted). "In our consideration of whether conduct is unitary, we have looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed." *DeGraff*, 2006-NMSC-011, ¶ 27. "[W]e will not find that a defendant's conduct is unitary where the defendant completes one of the charged crimes before committing the other." *Contreras*, 2007-NMCA-045, ¶ 21. We also "consider such factors as proximity in time and space, similarities, the sequencing of the acts, intervening events, and the defendant's goals for and mental state during each act." *State v. Vance*, 2009-NMCA-024, ¶ 13, 145 N.M. 706, 204 P.3d 31. Importantly, "the question of whether a defendant's conduct is unitary is not limited by the [s]tate's legal theory, but rather depends on the elements of the charged offenses and the facts presented at trial." *Contreras*, 2007-NMCA-045, ¶ 21 (internal quotation marks and citation omitted). Thus, "[t]he proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Franco*, 2005-NMSC-013, ¶ 7 (internal quotation marks and citation omitted). "We therefore first review the elements of the

8

charged offenses and then consider whether the [s]tate presented sufficient facts at trial in order to support the elements of both crimes." *Vance*, 2009-NMCA-024, ¶ 13.

{13}     Here, the jury was given three different jury instructions—one for each of the manufacturing charges, and one for the possession charge—containing the elements the State had to prove in order for Defendant to be convicted of Counts 1-3. On the first manufacturing charge (Count 2), the jury was instructed that the essential elements it had to find included that Defendant (1) manufactured (2) child pornography (3) *on or about January 26, 2013*. On the second manufacturing charge (Count 3), the jury was instructed that it had to find that Defendant (1) manufactured (2) child pornography (3) *on or about January 18, 2013*. And on the possession charge (Count 1), the jury was instructed that it had to find Defendant (1) had child pornography (2) in his possession (3) *on or about January 28, 2013*. On their faces, these instructions required the State to prove different elements—and thus different facts—based on the charges stemming from acts on three different dates: manufacturing on January 18, manufacturing on January 26, and possession on January 28.[4] Notably, Defendant does not contend that the jury relied on the same

_____

[4]We note that Defendant's double jeopardy argument relies on an outdated criminal information—the third amended criminal information filed in January 2014 rather than the *corrected* third amended criminal information filed in May 2014—that did not contain these distinct dates but instead identified January 28, 2013, as the date on which all alleged prohibited conduct occurred.

evidence to convict Defendant of possession and manufacturing, nor, as we next explain, would such a contention be availing. *Cf. id.* ¶ 14. We turn to the evidence presented at trial. *See id.* ¶ 15.

{14}     As to the manufacturing counts, Friend testified that Defendant was the person who recorded (i.e., manufactured) the videos and that the videos show her—a "child" under Section 30-6A-3(D)—and Defendant having sex (i.e., the videos were of child pornography). Detective Munro testified regarding the videos recovered from Defendant's phone that (1) the video titled "video 005"—which formed the basis for Count 2—had a "creation date" of January 26, 2013; and (2) the video titled "video 006"—which formed the basis for Count 3—had a "creation date" of January 18, 2013. This evidence alone was sufficient to support each of the distinct elements contained in Counts 2 and 3.

{15}     Regarding the possession charge—which was based not on any particular video but rather on what the State describes as Defendant's "possession of a collection of child pornography"[5]—the State presented altogether different evidence to establish the elements of possession than that used to support the manufacturing charges.

---

[5]The State originally relied on the video titled "us" to form the basis for the possession charge. However, the final criminal information filed prior to trial removed the specific reference to video "us" from the possession count and based the charge on Defendant's knowing and intentional possession of "any visual or print medium depicting" child pornography.

Deputy Hernandez testified that he executed a search warrant at Defendant's home on January 28, 2013, during which he seized Defendant's phone. He further testified that three videos were downloaded from the phone, meaning that it could be reasonably inferred that the videos existed on the phone—and thus were in Defendant's possession—on or about January 28 when the phone was seized from Defendant. Detective Munro, in addition to testifying that the videos had been created at an earlier point in time (i.e., on January 18 and 26, 2013), testified that two of the videos—those titled "us" and "video005"—had been "duplicated," meaning that a second copy of each video had been saved on the phone. Furthermore, all of the videos that were downloaded from the phone seized on January 28, 2013, were published to the jury; those videos showed Friend engaged in a prohibited sexual act (to wit, sexual intercourse). *See* § 30-6A-2(A)(1) (defining "prohibited sexual act" as including, among other acts, "sexual intercourse").

{16} From this, the jury could independently infer that Defendant completed a separate act—possession of child pornography—that was sufficiently distinct from the previously completed acts of manufacturing because the acts of manufacturing and possession were separated not only in time but also by the intervening event of the duplication of the videos. *See Vance*, 2009-NMCA-024, ¶¶ 13, 17; *Contreras*, 2007-NMCA-045, ¶¶ 19, 22-23 (rejecting a double jeopardy challenge to convictions

11

for possessing and trafficking cocaine where the state had "provided the jury with sufficient factual bases for finding that [the d]efendant possessed the cocaine both before and after he sold some if it[,]" and holding that the conduct supporting possession and trafficking was not unitary). Ignoring the evidence of duplication—which implies a later action by Defendant taken in order to continue to possess the copied videos—Defendant argues that he "took no additional steps to commit the crime of possession; the cell phone stored the recording automatically." But that is not what the evidence presented at trial indicates. Moreover, as in *Contreras*, we conclude that "it is extremely unlikely that the jury based its verdict on a theory that [the d]efendant only possessed" the videos at the time he manufactured them. 2007-NMCA-045, ¶ 23. Rather, the evidence established that Defendant continued to possess the videos after he had completed the act of manufacturing them and that the State's basis for charging Defendant with possession was separate and independent from the bases for charging him with manufacturing.

{17}     We hold that Defendant's separate acts of manufacturing and possessing child pornography were not unitary under the facts of this case because there was distinct evidence from which "the jury reasonably could have inferred independent factual bases for the charged offenses." *Vance*, 2009-NMCA-024, ¶ 17 (internal quotation

marks and citation omitted). Thus, Defendant's convictions do not violate his right to be free from double jeopardy.

## II.    Evidentiary Errors

{18}    Defendant argues that multiple evidentiary errors deprived him of a fair trial. Specifically, he contends that the district court erred in admitting: (1) Stepdaughter's testimony that she had witnessed a prior sexual encounter between Defendant and Friend; (2) Detective Munro's opinion testimony—including his comparison of photographs of Defendant's torso with screenshot images from the videos—regarding his belief that Defendant was the male participant in the videos; and (3) Deputy Hernandez's statements indicating there was another "victim" in the case. We address each of Defendant's claimed evidentiary errors in turn and conclude that even assuming error occurred, it was harmless, not cumulative, and does not require reversal.

## A.    Stepdaughter's Testimony Regarding Defendant's and Friend's Prior Sexual Encounter

{19}    Defendant filed a motion in limine seeking to exclude Stepdaughter's testimony "concerning what she perceived as sexual activity between [D]efendant and [Friend]" on a prior occasion. The district court denied the motion, and Stepdaughter was allowed to testify as follows. On one occasion, Stepdaughter saw Friend "moving up and down" in the bedroom around ten o'clock at night and that Defendant, who

was also in the bedroom, had his pajama pants pulled down "more than they should've been." Based on that observation, she confronted Friend about whether Friend was having a sexual relationship with Defendant. Stepdaughter thereafter reported to an adult her "concerns about [Friend] . . . and things going on at [the] house" and spoke with law enforcement a few days after making her initial report.

{20} Defendant argues that under Rule 11-404(B) NMRA, Stepdaughter's testimony about a prior sexual contact between Friend and Defendant should not have been admitted because it was offered for the prohibited purpose of showing that because Defendant "had relations with [Friend] on one day, he was more likely to act in conformity on the day the video was made[,]" and because its probative value was outweighed by its prejudicial effect. *See State v. Dietrich*, 2009-NMCA-031, ¶ 40, 145 N.M. 733, 204 P.3d 748 (explaining that appellate courts "consider two paramount factors in deciding whether the district court abused its discretion in admitting [Rule 11-404(B)] evidence: whether the [s]tate made a sufficient showing that the evidence would serve a legitimate purpose other than to show character . . . and whether the probative value was substantially outweighed by the danger of unfair prejudice or other factors" (internal quotation marks and citation omitted)). The State argues that the testimony was "properly admitted for purposes of establishing Defendant's identity and opportunity to film a sexual act with [Friend.]"

14

{21}     While the State is correct that proving "identity" is a proper purpose for which otherwise inadmissible Rule 11-404(B) evidence may be admitted, it is the proponent's burden "to cogently inform the court—whether the trial court or a court on appeal—the rationale for admitting the evidence to prove something other than propensity. In other words, more is required to sustain a ruling admitting other-acts evidence than the incantation of the illustrative exceptions contained in the Rule." *State v. Gallegos*, 2007-NMSC-007, ¶ 25, 141 N.M. 185, 152 P.3d 828 (alteration, internal quotation marks, and citation omitted). We are not convinced that the State has met its burden, particularly given that "[t]he identity exception to Rule 11-404(B) may be invoked when identity is at issue *and when the similarity of the other* [*act*] *demonstrates a unique or distinct pattern easily attributable to one person.*" *State v. Peters*, 1997-NMCA-084, ¶ 14, 123 N.M. 667, 944 P.2d 896 (emphasis added) (alteration, internal quotation marks, and citation omitted). The State, without pointing to anything in Stepdaughter's testimony that demonstrates a unique or distinct pattern that would be easily attributable to Defendant, merely argues that "because Defendant and [Friend] were engaged in a sexual relationship at the time the videos were manufactured and the videos depict[] sexual acts between [Friend] and a male, it becomes more likely that Defendant is the male in the video." Additionally, the State fails to establish that "opportunity" was even a fact in issue, meaning that

it could not have served as the basis for the admission of the testimony. *See Gallegos*, 2007-NMSC-007, ¶¶ 33-35 (rejecting "opportunity" as a basis for admitting Rule 11-404(B) evidence where the undisputed facts established that the defendant had an opportunity to commit the charged acts).

{22}     However, even assuming, without deciding, that the district court's admission of Stepdaughter's testimony was contrary to Rule 11-404(B), we conclude that such error was harmless. *See State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110 (explaining that even if evidence is improperly admitted, such error "is not grounds for a new trial unless the error is determined to be harmful"); *State v. Griscom*, 1984-NMCA-059, ¶¶ 16-18, 101 N.M. 377, 683 P.2d 59 (proceeding to a harmless error analysis without first resolving the primary evidentiary challenge). That is because after evaluating "all of the circumstances surrounding the error"—including "the importance of the erroneously admitted evidence in the prosecution's case"—as well as "evidence of [Defendant's] guilt separate from the error[,]" we conclude that there is not a "reasonable probability the error affected that verdict." *Tollardo*, 2012-NMSC-008, ¶¶ 36, 43 (alteration, emphasis, internal quotation marks, and citation omitted).

{23}     The primary evidence supporting Defendant's convictions for manufacturing of child pornography came from (1) Friend's testimony that Defendant was the male

16

participant in the videos and that he was the person recording the videos of the two of them having sexual intercourse, and (2) the videos themselves and the photographs of Defendant's torso showing a distinct scar, which were admitted at trial and shown to the jury over no objection. The primary evidence supporting Defendant's conviction for possession of child pornography came from (1) Deputy Hernandez's testimony regarding seizing Defendant's phone, which contained the videos, from Defendant's residence on January 28, 2012, and (2) the videos themselves, which contained child pornography. From the State's closing argument, it is clear that the State attributed little, if any, importance to Stepdaughter's challenged testimony. On numerous occasions, the State emphasized the aforementioned unchallenged pieces of evidence as being what supported the charges against Defendant. On only one occasion did the State, in passing, refer to Stepdaughter's statement that Stepdaughter once saw "something going on in the bedroom." In fact, it was defense counsel who, during closing, repeatedly reminded the jury of the evidence he sought to exclude when he first stated, "[Stepdaughter] is so outraged because she sees a head bobbing up and down that she feels compelled to report it[,]" and later reiterated, "[Stepdaughter] said the reason she was outraged is because she could see a fully-dressed young lady with her head going up and down, and that's the reason [Stepdaughter] was propelled out into reporting this."

17

{24}   In the context of all of the evidence presented at trial, we cannot say that there is a reasonable probability that Stepdaughter's testimony describing her observation of a sexual encounter between Friend and Defendant contributed to any of Defendant's convictions. *See id.*¶ 46 (explaining that "because an error may be prejudicial with respect to one conviction, but harmless with respect to another, courts must separately assess the effect the error may have had on each of the defendant's convictions"). We thus hold that any error that occurred in admitting Stepdaughter's testimony was harmless and does not support reversal.

**B.     Detective Munro's and Deputy Hernandez's Testimony**

{25}   Defendant alleges three evidentiary errors related to the testimony of Detective Munro and Deputy Hernandez. First, Defendant contends that the district court erred in allowing Detective Munro to engage in "image-to-image comparison" and "digital manipulation" of the photographs of Defendant's torso and the screenshot images that Detective Munro made from the videos without first qualifying Detective Munro as an expert. Next, Defendant alternatively argues that Detective Munro's testimony—if deemed lay opinion—was inadmissible because it was not "helpful to a factual issue in dispute." Finally, regarding Deputy Hernandez's testimony, Defendant argues that Deputy Hernandez's "repeated references to a 'second victim' result[ed] in undue

18

prejudice." Because the parties dispute whether certain of these challenges were preserved, we begin by identifying the applicable standard of review.

{26} Defendant concedes that he failed to preserve his challenge to Deputy Hernandez's testimony, as well as his challenge to the admission of Detective Munro's testimony adjusting the screenshot images and comparing those images to the photograph of Defendant's torso as lay opinion. Absent preservation, we only review for plain error. *See State v. Bregar*, 2017-NMCA-028, ¶ 28, 390 P.3d 212, *cert. denied*, ___-NMCERT-___ (No. S-1-SC-36258, Feb. 7, 2017) ("If an appellant fails to object to the admission of evidence below, on appeal we will only review for plain error[.]"). With regard to the admission of alleged improper expert testimony by Detective Munro, while not clear, Defendant appears to suggest that he preserved his challenge to the admission of that testimony; however, his failure to comply with the requirements of Rule 12-318(A)(4) NMRA renders his argument waived. Rule 12-318(A)(4) requires that as to each argument made on appeal, the appellant's brief in chief "shall contain a statement of the applicable standard of review . . . and a statement explaining how the issue was preserved in the court below, with citations to authorities, record proper, transcript of proceedings, or exhibits relied on." Defendant neither explains how the issue was preserved nor argues that we should apply an abuse of discretion standard. *See Bregar*, 2017-NMCA-028, ¶ 28 (explaining

that "if an evidentiary issue is preserved by objection, we review the district court's decision to admit or exclude for an abuse of discretion"). Moreover, Defendant does nothing more than describe three instances during trial when defense counsel objected during Detective Munro's testimony. Critically, Defendant wholly fails to establish that the grounds for those objections—one of which Defendant concedes was, in fact, "inaudible"—are the same that provide the basis for his challenges on appeal. Thus, we do not consider his appellate arguments to be properly preserved. *See State v. Baca*, 1997-NMSC-045, ¶ 13, 124 N.M. 55, 946 P.2d 1066, *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36, 146 N.M. 357, 210 P.3d 783 ("An objection that does not state the grounds for the objection preserves no issue for appeal."); *Bregar*, 2017-NMCA-028, ¶ 29 ("[F]or an objection to preserve an issue for appeal, it must appear that the appellant fairly invoked a ruling of the district court on the same grounds argued in the appellate court." (alterations, internal quotation marks, and citation omitted)); *State v. Gonzales*, 2011-NMCA-007, ¶ 19, 149 N.M. 226, 247 P.3d 1111 (stating that "this Court has no duty to review an argument that is not adequately developed"). We therefore review Defendant's challenges to Detective Munro's testimony for plain error. *See Bregar*, 2017-NMCA-028, ¶ 28.

**Plain Error**

{27} "Plain error is an exception to the general rule that parties must raise timely objection to improprieties at trial, and therefore it is to be used sparingly." *State v. Dylan J.*, 2009-NMCA-027, ¶ 15, 145 N.M. 719, 204 P.3d 44 (internal quotation marks and citation omitted). "Under the plain error rule, there must be (1) error, that is (2) plain, and (3) that affects substantial rights." *State v. Hill*, 2008-NMCA-117, ¶ 21, 144 N.M. 775, 192 P.3d 770 (internal quotation marks and citation omitted). "We apply the rule only in evidentiary matters and only if we have grave doubts about the validity of the verdict, due to an error that infects the fairness or integrity of the judicial proceeding." *Dylan J.*, 2009-NMCA-027, ¶ 15 (internal quotation marks and citation omitted). Appellate courts do not "use the plain error rule to review the validity of the admission of [erroneously admitted] testimony." *State v. Contreras*, 1995-NMSC-056, ¶ 24, 120 N.M. 486, 903 P.2d 228. "We must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict." *Id.* ¶ 23 (internal quotation marks and citation omitted). "In determining whether there has been plain error, we must examine the alleged errors in the context of the testimony as a whole." *Dylan J.*, 2009-NMCA-027, ¶ 15 (omission, internal quotation marks, and citation omitted).

**Detective Munro's Testimony**

{28} Detective Munro's primary purpose at trial was to explain how, as a result of his investigation, he concluded that Defendant was the male participant in the videos. Detective Munro did so by first describing the personal observations he made from watching the videos. He testified that while only the face of the female in the videos was "readily apparent," the abdomen and genitals of the male participant were visible and contained what Detective Munro described as a "consistent abnormality to the abdomen, . . . some sort of scar or possibly a tattoo" in each of the videos. He then explained that he reviewed photographs of Defendant's unclothed torso that were taken by a fellow investigating officer and watched the videos again, comparing the images in the video of the male participant's abdominal area to the photographs of Defendant. The State published the photographs taken of Defendant's abdominal area, which, Detective Munro testified, showed a "vertical scar that goes above and below the belly button" that was similar to what Detective Munro observed on the videos. At that point in Detective Munro's testimony, the State published Exhibit 1—containing the three videos—to the jury and asked that Detective Munro be allowed to play the videos for the jury. One by one, the jury was shown each of the three videos. After each video was played, Detective Munro explained that he made screenshots—also described as "freeze frames"—from the video, displayed the

22

screenshot, then pointed to the area on the screenshot showing the same "indentation" or "abnormality" that Detective Munro had pointed out to the jury in the photographs of Defendant. While publishing the screenshot images to the jury, Detective Munro noted that the images as projected in the courtroom were "a little dark" and offered to "lighten [the] image if it could assist." As he was making the in-court adjustments to the laptop display settings, Detective Munro explained that "without altering the actual intent of it, I can adjust the brightness level and increase the contrast."

{29}     Defendant describes these adjustments as "digital manipulation" and "digital alteration." Citing a Connecticut case, *State v. Swinton*, 847 A.2d 921, 934-38 (Conn. 2004), he contends that "digital alteration of digital images is . . . the province of expert testimony" and thus that Detective Munro's reliance on "specialized knowledge" in "comparing [Defendant's] torso photos to the video[s]" was only admissible if he was first qualified as an expert. Defendant's argument is unavailing for two reasons: first, because *Swinton* is distinguishable; and second, because Defendant misconstrues the nature of Detective Munro's testimony.

{30}     In *Swinton*, the defendant challenged the adequacy of the foundation for admitting what he contended was "computer generated evidence"—specifically, photographs of a bite mark that had been digitally enhanced using a computer software program. *Id.* at 934-36. The state argued that the photographs were not

23

"computer generated evidence" but were "mere 'reproductions' " and thus governed by a different foundational standard that only required the testifying witness to be able to verify that the photograph is "a fair and accurate representation of what it depicts." *Id.* at 936-37. The court described the issue as being one that involved a question of "the difference between *presenting* evidence and *creating* evidence." *Id.* at 938. It agreed with the defendant that the photographs admitted were "computer generated"—i.e., "created"—and not mere photographic reproductions and thus were subject to different foundational requirements. *Id.* at 936, 938, 942-43. However, after applying the proper test as announced in that case, the court concluded that the state had laid a proper foundation to admit the evidence. *Id.* at 943-45.

{31}   Here, Defendant attempts to liken Detective Munro's in-court adjustments to the laptop's display setting (for the purpose of improving the visibility of the image being projected to the jury) to the software-altered, i.e., computer-generated, photographs in *Swinton*. According to Defendant, Detective Munro's testimony included the presentation of "altered photographs," but that is simply not what the record indicates. The record is clear (1) that Detective Munro's screenshots were nothing more than "freeze frames," i.e., images depicting single frames from the video akin to pausing the video at a particular moment, and (2) that Detective Munro did nothing more than alter the "brightness" setting on the laptop to control the

24

outward projection of the image. Unlike in *Swinton*, where the witness's testimony included an in-court demonstration of how he used special software to manipulate the bite-mark photograph, *id.* at 935, i.e., there was no doubt that the photographs themselves were altered before being presented to the jury, here, there is no evidence that any of the images presented to the jury had been modified in any way. As noted previously, Detective Munro even stated that the in-court adjustments he was making were done "without altering the actual intent." We have little difficulty concluding that the screenshots and Detective Munro's testimony were simply a means of *presenting* evidence to the jury rather than the creation of new evidence that would necessitate qualification as expert opinion. *Cf. id.* at 938. As such, they did not constitute expert testimony, and we hold that there was no error in not qualifying Detective Munro as an expert.

{32}     Defendant next argues that Detective Munro's testimony identifying Defendant as the male in the videos was improper lay opinion because "the jury could watch the video[s] for itself," meaning that Detective Munro's testimony was not "helpful to [determining] a factual issue in dispute"—i.e., the identity of the male participant—as required by Rule 11-701 NMRA. *See* Rule 11-701(B) (providing that "testimony in the form of an opinion is limited to one that is . . . helpful . . . to determining a fact in issue"). This Court recently rejected a similar argument in *State v. Sweat*, 2017-

25

NMCA-069, ¶¶ 20-24, 404 P.3d 20, *cert. denied*, ____-NMCERT-___ (No. S-1-SC-36574, Aug. 16, 2017).

{33} In *Sweat*, the issue was whether a detective was properly allowed to testify to his opinion of the identity of the person shown in a surveillance video, which had been admitted into evidence and was available for the jury to view. *Id.* ¶¶ 8, 21. The defendant argued that "the surveillance video speaks for itself" and that allowing the detective to offer his opinion "invaded the province of the jury" by not "allowing the jury to view the surveillance video and draw its own conclusion." *Id.* ¶ 21 (internal quotation marks omitted). This Court concluded otherwise, adopting for purposes of analysis the five-factor approach "deemed relevant to a determination of whether a lay witness is more likely than the jury to identify the defendant correctly" that was articulated in *People v. Thompson*, 2016 IL 118667, ¶ 41, 49 N.E.3d 393. *Sweat*, 2017-NMCA-069, ¶ 22 (internal quotation marks and citation omitted). Relevant to the *Sweat* Court's analysis was, among others, the fifth factor: "the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording." *Id.* ¶¶ 22, 24 (internal quotation marks and citation omitted). In *Sweat*, this Court considered that the defendant "himself describe[d] the quality of the surveillance video as 'grainy' and 'of poor quality' " in reaching its conclusion that the detective's testimony regarding the identity of the person in the

26

surveillance video was admissible because it was helpful to the jury.[6] *Id.* ¶ 24. Likewise, here, Defendant describes the videos in question as "dark and grainy" and asserts that "scarring or other details in the video are *not* clear . . . when viewed on a computer monitor." Thus, we conclude that Detective Munro's testimony was admissible under Rule 11-701 because it would have been "helpful . . . to determining a fact in issue[,]" i.e., the identity of the male participant in the videos. *Id.* ¶ 22 (internal quotation marks and citation omitted). Because we hold that it was not error to admit Detective Munro's testimony, our review of Defendant's challenge on that basis ends here. *See Hill*, 2008-NMCA-117, ¶ 21 ("Under the plain error rule, there must be (1) error, that is (2) plain, and (3) that affects substantial rights." (internal quotation marks and citation omitted)).

**Deputy Hernandez's Testimony**

{34}     As with our plain-error review of Detective Munro's testimony, we begin by examining the complained-of portion of Deputy Hernandez's testimony as a whole. *See Dylan J.*, 2009-NMCA-027, ¶ 15.

---

[6]While the *Sweat* Court also considered the presence of other factors, it stated that "[t]he existence of even one of the[] factors indicates that there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury[,]" i.e., that the witness's testimony is admissible under Rule 11-701 because it is helpful to the jury. *Id.* ¶ 22.

{35} During Deputy Hernandez's testimony, the State moved to admit into evidence Exhibit 1, the CD containing the videos downloaded from Defendant's phone. Defense counsel objected, arguing that the State had not laid a sufficient foundation for the admission of the CD because it had not been established whether Deputy Hernandez was the "police officer [that created the CD] or not." During defense counsel's ensuing voir dire of Deputy Hernandez, defense counsel elicited from Deputy Hernandez that the videos were taken off the cell phone using Cellebrite,[7] and that Deputy Hernandez was not the person who downloaded the videos onto the CD. Based on this, defense counsel again objected to the CD's admission, arguing that the State had not established chain of custody. Even after the State established that Deputy Hernandez was present when the CD was created, took possession of the CD after it was created, and could confirm that the data on the CD was identical to that on the cell phone, defense counsel continued to object to the CD's admission.

{36} Defense counsel was allowed to continue his voir dire, during which he questioned Deputy Hernandez about the serial numbers of the seized cell phones that Deputy Hernandez had recorded on the search warrant inventory. Defense counsel

[7]Later testimony from Detective Munro clarified that Cellebrite is a "forensic evidence recovery device" that (1) allows for the removal of information from a cell phone onto a CD, USB, or other storage device, (2) prevents the cell phone and information contained thereon from "being manipulated in any way" during the removal/copying process, and (3) generates a report and a CD on which the evidence can be reviewed without risk of manipulating the cell phone.

28

then questioned Deputy Hernandez about information contained on the Cellebrite-generated report, which contained numbers identifying each of the cell phones that had been seized, and attempted to show that the serial numbers documented in the search warrant inventory did not match the numbers contained in the Cellebrite report. Deputy Hernandez, after comparing the documents, confirmed that the numbers on the two documents did not match. Defense counsel, seizing upon what he perceived as a fatal discrepancy, then challenged Deputy Hernandez to explain how the court could admit "evidence of a cell phone that wasn't seized." Deputy Hernandez responded by pointing out to defense counsel that the Cellebrite report in question "has nothing to do with [Friend]" but rather contained the name of a different person, whom Deputy Hernandez referred to as "also a victim."

{37} Upon hearing Deputy Hernandez refer to another "victim," the district court immediately called a bench conference, asked counsel if the current line of questioning should occur outside the presence of the jury, and excused the jury. The district court, attempting to clarify matters, asked counsel if the discrepancy in the numbers was attributable to there being separate evidence related to another victim. The prosecutor answered "no" and explained that the numbers did not match because the Cellebrite report contained the phones' model numbers, not serial numbers. After a short recess, defense counsel indicated he had no further voir dire and agreed to

29

allow the State to proceed with its direct examination of Deputy Hernandez. The State then laid a foundation for the admission of and again moved to admit Exhibit 1, which the district court then admitted over no objection.

{38}     In light of the context of Deputy Hernandez's testimony, we conclude that it was not plain error to admit Deputy Hernandez's passing mention of another "victim." As Defendant himself describes it, what he complains of is "essentially a spontaneous statement"—one that the record indicates Deputy Hernandez inadvertently made as he explained counsel's misinterpretation of documents on which the State relied for the admission of key evidence. While it may have been error to allow Deputy Hernandez to testify as he did, and while such error could be deemed plain as evidenced by the district court's immediate reaction to the testimony, we are unconvinced that admission of the testimony "constituted an injustice that creates grave doubts concerning the validity of the verdict." *Hill*, 2008-NMCA-117, ¶ 21 (internal quotation marks and citation omitted). That is to say, the error did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings[,]" i.e., the substantial rights of Defendant. *State v. Paiz*, 1999-NMCA-104, ¶ 28, 127 N.M. 776, 987 P.2d 1163 (internal quotation marks and citation omitted); *cf. id.* ¶¶ 26-29 (reversing the defendant's conviction because this Court concluded that all three elements of the plain error test—"(1) error, that is (2) plain,

30

and (3) that affects substantial rights"—were present in that case). As such, we hold that the admission of Deputy Hernandez's testimony was not plain error.

{39}    As a final matter regarding Defendant's challenge to Deputy Hernandez's testimony, we briefly address Defendant's claim of ineffective assistance of counsel that he appends to this argument. Defendant argues that "eliciting this [other 'victim'] evidence during an unnecessary voir dire [of Deputy Hernandez] without then seeking a mistrial or at least a curative instruction constituted ineffective assistance of counsel." We disagree.

{40}    "To establish ineffective assistance of counsel, a defendant must show: (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *State v. Paredez*, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Without passing on Defendant's arguments regarding the deficient-performance prong, we conclude that Defendant has not met his burden of establishing a prima facie case for ineffective assistance of counsel based on his failure to explain how any alleged deficiency in trial counsel's performance prejudiced him. Defendant does nothing more than quote the standard for establishing prejudice[8], then states, "As argued above, [Deputy

---

[8]"[I]n order to satisfy the prejudice prong, it is necessary to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]" *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 28, 130 N.M. 179, 21 P.3d 1032 (internal quotation marks and citation omitted).

Hernandez's references to a second victim] was of an inherently prejudicial nature and implicated prior acts of a similar nature to those charged, carrying an obvious prejudicial impact." But "mere evidentiary prejudice is not enough." *State v. Roybal*, 2002-NMSC-027, ¶ 25, 132 N.M. 657, 54 P.3d 61. Because Defendant does nothing more than point to evidentiary prejudice and fails to explain how any deficiency in trial counsel's performance "represent[s] so serious a failure of the adversarial process that it undermines judicial confidence in the accuracy and reliability of the outcome[,]" *id.*, we decline to further consider Defendant's argument. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments).

**C.    Cumulative Error**

{41}    Defendant contends that "[i]f this Court finds error in any two of the above issues, cumulative error supports reversal." Defendant is incorrect. The mere fact that more than one error may have occurred is insufficient, alone, to require reversal. The doctrine of cumulative error "requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Martin*, 1984-NMSC-077, ¶ 17, 101 N.M. 595, 686 P.2d 937. "The doctrine cannot be invoked if . . . the record as a whole demonstrates that a defendant received a fair trial[.]" *Id.* Importantly, "a fair trial is

not necessarily a perfect one[.]" *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728. Even given the purported imperfections in Defendant's trial—i.e., failing to correct the admission of Deputy Hernandez's testimony regarding another "victim" and allowing Stepdaughter to testify to observing a prior sexual encounter between Defendant and Friend—we conclude that the record as a whole demonstrates that Defendant received a fair trial.

**III.    The Constitutionality of Section 30-6A-3(D) as Applied in This Case**

{42}    Defendant contends that "contrary to constitutional guarantees of equal protection and substantive due process, there is no rational basis for punishing [Defendant] with second-degree manufacture and fourth-degree possession for recording a sex act to which the minor participant legally consented." Defendant's equal protection challenge fails because he has not established that he is being treated differently than similarly situated individuals. *See Breen v. Carlsbad Mun. Schs.*, 2005-NMSC-028, ¶ 10, 138 N.M. 331, 120 P.3d 413 ("The threshold question in analyzing all equal protection challenges is whether the legislation creates a class of similarly situated individuals who are treated dissimilarly."). Those who challenge the constitutionality of a statute "must first prove that they are similarly situated to another group but are treated dissimilarly. In other words, [they] must prove that they should be treated equally with another group but they are not because of a legislative

classification." *Id.* ¶ 8. A statute that "does not create two separate classifications subject to different treatment" cannot be said to violate equal protection. *Montez v. J & B Radiator, Inc.*, 1989-NMCA-060, ¶¶ 12, 14-15, 108 N.M. 752, 779 P.2d 129.

{43} Defendant is in a class of persons that includes (1) adults who have (2) recorded consensual, non-criminal sexual acts (3) involving a minor participant. Defendant compares himself to "[a] person who records the same exact legal [sexual] activity with a consenting eighteen-year-old." Defendant emphasizes the fact that the underlying act Defendant recorded—sexual intercourse between a thirty-five-year-old and a sixteen-year-old—is not criminal. However, he ignores the purpose of and harm addressed by the Sexual Exploitation of Children Act, which defines "prohibited sexual act" as including, among other acts, "sexual intercourse" regardless of whether the act was, itself, legal. Section 30-6A-2(A). As our Supreme Court explained in *State v. Myers*, 2009-NMSC-016, 146 N.M. 128, 207 P.3d 1105, "The purpose of the Act is to protect children from the harm to the child that flows from trespasses against the child's dignity when treated as a sexual object." *Id.* ¶ 17 (internal quotation marks and citation omitted). Thus, even if the act recorded is legal, the act of recording the act is what the Legislature elected to criminalize based on the harm that occurs when "the child's actions are reduced to a recording which could haunt the child in future years[.]" *Id.* (internal quotation marks and citation omitted).

34

{44}     Defendant's comparison, in addition, is not a proper one because a person who records consensual sex between two adults is not similarly situated to a person who records consensual sex between an adult and a minor; such individuals occupy entirely different classes. *Cf. Packer Corp. v. Utah*, 285 U.S. 105, 110 (1932) (rejecting an equal protection challenge to a state law that treats differently tobacco advertisements on billboards and those in newspapers, magazines, or periodicals, and explaining that "the state has power to legislate with respect to persons in certain situations and not with respect to those in a different one"); *Carney v. Okla. Dep't of Pub. Safety*, 875 F.3d 1347, 1353 (10th Cir. 2017) (explaining that a convicted "aggravated sex offender" had failed to make an equal protection claim where he contended that he was "not similarly situated to ordinary sex offenders" and "ha[d] not shown that he [was] being treated differently than other aggravated sex offenders"); *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 53-54 (10th Cir. 2013) (explaining that the Equal Protection Clause "simply keeps governmental decision[]makers from treating differently persons *who are in all relevant respects alike*" and rejecting an equal protection challenge where the plaintiffs failed to establish that their prohibited activity—which the court described as "different in kind and scale"—was similar to permitted activity (internal quotation marks and citation omitted)). Because Defendant cites no authority and develops no argument

35

to support his contention that he is, in the first instance, similarly situated to his proffered comparator, we decline to consider further his equal protection challenge. *See Guerra*, 2012-NMSC-014, ¶ 21; *State v. Murillo*, 2015-NMCA-046, ¶ 17, 347 P.3d 284 (refusing to consider the defendant's equal protection argument where the defendant failed to address how the challenged statute treated differently groups that were similarly situated).

{45}     Defendant—who dedicates the majority of his discussion on this issue to arguing that the Legislature lacks a rational basis for treating differently adults who record sex acts depicting minors than those who record sex acts depicting adults—similarly fails to provide any principled analysis to support his claim of a substantive due process violation. He does nothing more than (1) refer to general principles of law without explaining how they apply to the facts of this case and (2) rely on the irrelevant claim that Defendant "had *no* intent to disseminate the video" to support his assertion that "it shocks the conscience to punish [Defendant] with [nineteen-and-one-half-years] in prison." We decline to construct Defendant's argument on his behalf, *see Murillo*, 2015-NMSC-046, ¶ 17, and hold that Defendant has failed to establish either an equal protection or a substantive due process violation.

{46}    As a final matter, we offer as an observation that Defendant's challenge is more properly directed to the attention of the Legislature than the courts. What Defendant essentially—though obliquely—asks us to do is that which we are constitutionally prohibited from doing: encroach on the power of the Legislature by questioning the wisdom of its enactments, particularly when Defendant has failed to establish that the challenged enactment is constitutionally infirm. *See State v. Thompson*, 1953-NMSC-072, ¶¶ 11-12, 57 N.M. 459, 260 P.2d 370 ("The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. . . . It is no part of the duty of the courts to inquire into the wisdom, the policy, or the justness of an act of the [L]egislature." (internal quotation marks and citation omitted)); *State v. Torres*, 2012-NMCA-026, ¶ 33, 272 P.3d 689 (explaining that under the doctrine of separation of powers, "one branch of the state government may not exercise powers and duties belonging to another" (internal quotation marks and citation omitted)).

{47}    Our Legislature has, by enacting Section 30-6A-3, established as the policy of this state that it is a crime to record sexual activity where at least one of the depicted participants is a minor, regardless of whether the underlying activity depicted is non-criminal. Defendant contends that the fact that Friend could consent to the underlying

37

act—i.e., legally engage in sexual intercourse with Defendant—but is disallowed under the law from consenting to a recording of that act is irrational. Yet it is the Legislature's prerogative to do exactly that: declare and define what acts are criminal. *See State v. Lassiter*, 2016-NMCA-078, ¶ 12, 382 P.3d 918, *cert. denied*, ___-NMCERT-___ (No. S-1-SC-36012, Aug. 18, 2016) ("It is the Legislature's exclusive responsibility to define crimes, not the judiciary's."); *State v. Bryant*, 1982-NMCA-178, ¶ 14, 99 N.M. 149, 655 P.2d 161 ("The decision as to which acts shall be declared criminal offenses is entirely a legislative function."). And to the extent Defendant challenges not only the very criminalization of the conduct at issue but also the degree to which the Legislature has elected to punish the conduct, such a challenge is equally afield of this Court's powers. *See State v. Frawley*, 2007-NMSC-057, ¶ 6, 143 N.M. 7, 172 P.3d 144 ("No point of law has longer been established in New Mexico than the rule that the prescription of the mode of punishment is pre-eminently a rightful subject of legislation." (alterations, internal quotation marks, and citation omitted)). Even were this Court to agree with Defendant that the length of his sentence is disproportionate to the offense committed given the particular facts of this case,[9] Defendant has failed to offer any basis on which we could properly—i.e.,

---

[9]Notably, even the district court initially expressed concern about the State's recommendation of nineteen-and-a-half years, asking the State how the court could reconcile such a sentence with the ten-year sentence it had just imposed in a different case on a defendant who had killed a person. However, apparently persuaded by the

within the limits of our constitutional authority—consider this issue. "The question of whether the punishment for a given crime is too severe and disproportionate to the offense is for the [L]egislature to determine." *State v. Peters*, 1967-NMSC-171, ¶ 10, 78 N.M. 224, 430 P.2d 382 (internal quotation marks and citation omitted). Thus we leave it for the Legislature to address whether someone—like Defendant—who records a legal sexual act with a consenting minor should be subject to the sentence Defendant received in this case.[10]

## IV.     Sufficiency of the Evidence

{48}     Defendant argues that the State failed to present sufficient evidence to sustain his convictions. We disagree.

{49}     "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a

State's argument regarding the distinctions between the two cases and likely owing to the fact that defense counsel neither argued that there were mitigating factors the court should consider nor asked the court to run the sentences concurrently, the district court acted within its discretion and sentenced Defendant in accordance with the State's recommendation.

[10]We note that the Legislature, in fact, very recently amended the Criminal Sentencing Act in order to *increase* the penalties for those who are convicted of manufacturing, distributing, and/or possessing child pornography. *Compare* Section 31-18-15 (2007), *with* Section 31-18-15 (2016)]. Under the amended act, someone convicted of the charges against Defendant in this case would face a term of imprisonment of up to thirty-four years: twelve years for each of the manufacturing counts and ten years for possession. *See* § 31-18-15(A)(6), (12).

39

reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and citation omitted). Our review involves a two-step process in which we first "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We then "evaluate whether the evidence, so viewed, supports the verdict beyond a reasonable doubt." *State v. Garcia*, 2016-NMSC-034, ¶ 24, 384 P.3d 1076. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Our appellate courts "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations, internal quotation marks, and citation omitted).

{50}     Contrary to these well-established rules, Defendant's entire sufficiency challenge is premised on reweighing the evidence, attacking the credibility of witnesses, and relying on evidence and inferences that would support a different result. As such and because we have previously reviewed at length the evidence that was presented in this case that supports Defendant's convictions for both

40

manufacturing and possession of child pornography, we see no need to rehash that evidence here. We hold that sufficient evidence supports each of Defendant's convictions.

**CONCLUSION**

{51}    For the foregoing reasons, we affirm Defendant's convictions.

{52}    **IT IS SO ORDERED.**


_____

**J. MILES HANISEE, Judge**


**WE CONCUR:**


_____

**MICHAEL E. VIGIL, Judge**


_____

**JULIE J. VARGAS, Judge**